# In the United States Court of Federal Claims

|  |  |
|---|---|
| ACCELGOV, LLC,<br><br>        *Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>        *Defendant,*<br><br>and<br><br>DYNANET CORPORATION,<br><br>        *Defendant-Intervenor.* | No. 24-1522<br>(Filed: December 2, 2024)[1] |

*Walter Brad English*, Maynard Nexsen PC, Huntsville, AL, for Plaintiff.

*Sean Kelly Griffin*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*Cara Lyn Sizemore,* Wiley Rein LLP, Washington, DC, for Defendant-Intervenor.

## OPINION AND ORDER

**LERNER,** *Judge.*

       This is a post-award bid protest. Plaintiff AccelGov, LLC ("AccelGov") challenges the United States Department of Health and Human Services, Substance Abuse and Mental Health Services Administration's ("SAMHSA" or "the Agency") award of a contract to provide Information Technology ("IT") services under Request for Quote 140D0424Q0555 ("the Solicitation" or "RFQ"). AccelGov is a joint venture between AGovX, LLC ("AGovX") and 22nd Century Technologies, Inc. ("22nd Century Technologies"). The Agency awarded the contract to Dynanet Corporation ("Dynanet" or "Intervenor"). After conducting a technical evaluation using three non-price factors, the Agency determined that Dynanet received the

---

[1] The Opinion was filed on November 15, 2024, and the parties were afforded time to propose redactions. Opinion & Order, ECF No. 44. Plaintiff proposed redactions and stated that Defendant and Intervenor agreed to the redactions. ECF No. 47. Accordingly, the Court reissues this Opinion with the agreed-upon redactions, which are noted with bracketed asterisks, i.e., [***].

highest possible score on all three factors while AccelGov received a lower score on Factor 1 and Factor 3. Under the Solicitation's guidelines, price was the least important factor. AR 1898. The Agency selected Dynanet for the award despite it offering a higher price than AccelGov. AR 1901.

According to AccelGov, the Agency's evaluation and award were arbitrary and irrational. Pl.'s Mot. for J. on the Admin. R. at 6 ("Pl.'s Mot. for J."), ECF No. 29. AccelGov asserts that under Factor 1 the Agency applied unstated evaluation criteria, made findings at odds with the record, and improperly penalized AccelGov for reliance on a subcontractor and making typos in its proposal. *Id.* at 7–21.

AccelGov also claims the Agency came to conclusions inconsistent with the record and applied criteria contrary to the Solicitation's requirements under Factor 3. *Id.* at 21–25. AccelGov alleges these evaluation errors resulted in a flawed and irrational best value trade-off analysis that were prejudicial. *Id.* at 26–27. In response, the Government and Intervenor argue that the Agency rationally determined that Dynanet's proposal provided the best value to the Government in a reasoned decision based on the technical evaluation factors.

Before this Court are the parties' Motions for Judgment on the Administrative Record and Plaintiff's Motion for Preliminary Injunction. Pl.'s Mot. for J.; Pl.'s Mot. for Prelim. Inj., ECF No. 3; Def.'s Corr. Mot. for J. on the Admin. R. ("Def.'s Corr. Mot."), ECF No. 32; Def.-Intervenor's Mot. for J. on the Admin. R. ("Def.-Intervenor's Mot."), ECF No. 28. The Court finds SAMHSA did not act arbitrarily in determining that AccelGov's proposal was inferior to Dynanet's based on the non-price factors and rationally awarded the contract to Dynanet despite its higher, but reasonable, price. The Solicitation was clear that the non-price factors were significantly more important than price, and AccelGov has not demonstrated that absent the alleged errors it would have matched Dynanet on the non-price factors. As a result, AccelGov has not met its burden to show that any alleged errors were prejudicial or that it would have had a substantial chance of winning the contract. As further explained below, Plaintiff's Motions are **DENIED**. Defendant's and Defendant-Intervenor's Motions are **GRANTED**.

## I.    Factual Background

### A.    The Solicitation

The Solicitation called for IT services to support IT infrastructure and operations. AR 237. The Solicitation stated the "objective of this procurement [was] to obtain highly specialized technical Infrastructure and Operations Support Services to assist [SAMHSA] in executing and accomplishing its mission and objectives." AR 238. For this Solicitation, SAMHSA utilized the United States Department of the Interior, Interior Business Center, Acquisitions Services Directorate ("DOI"). AR 235. The Solicitation was issued under the General Services Administration ("GSA") Multiple Awards Schedule ("MAS") Category 5414HEAL: Health Information Technology Services. *Id.* Federal Acquisition Regulation ("FAR") Subpart 8.4 controlled. *Id.* DOI sent the RFQ to small business contract holders, including AccelGov and Dynanet, on June 25, 2024. AR 1875. The Agency amended the Solicitation once on July 9,

2024.  *Id*.  The period of performance was a one-year base period and four one-year option periods.  AR 283.

The RFQ Statement of Work ("SOW") described SAMHSA's needs through nine identified task areas and defined specific contractor responsibilities under each task area.  AR 237–82.  The RFQ instructed Offerors to submit quotes in five volumes: Volume I consisted of responses to various technical requirements; Volume II comprised three past performance references (including at least two from the Prime Contractor); Volume III contained the Offeror's price; and Volumes IV and V included technical and price assumptions, conditions, or exceptions, if any.  AR 310–14.

### B.    Evaluation Criteria

The Solicitation stated that evaluators would grade proposals using four factors: Factor 1, Technical Approach, Management Approach, and Understanding of the SOW; Factor 2, Staffing Plan, Transition-In Plan, and Personnel Qualifications; Factor 3, Past Performance; and, finally, Price.  AR 315–16.  The "non-price factors [were] of equal importance, and when combined, [were] *significantly* more important than price."  AR 316 (emphasis added).  The Agency would make the award "to the Offeror that represents the Best Value to the Government and proposes a reasonable price."  *Id.*  The Solicitation explained that "[t]he Government reserves the right to make an award to other than the lowest priced Offeror if the technical benefits of the higher priced quote are determined to be worth the additional price."  *Id.*

The Solicitation set forth the following evaluation criteria for Factor 1 and Factor 3:

**Factor 1.    Technical Approach, Management Approach, and Understanding of the SOW**
The Offerors will be evaluated based upon their proposed understanding of the objectives of the SOW and planned approach to successfully accomplishing the effort.  The Government will assess the extent to which the Offeror demonstrates a detailed understanding of the requirements and sufficiently identifies proposed methods and techniques for completing each task in the SOW.  The Government will evaluate the extent to which the Offeror demonstrates methods for improving the program's operations, reducing costs, and lowering administrative burdens. The Government will evaluate the extent to which the Offeror's approach to quality assurance, project management, and control processes to track and manage performance as identified in the Project Management Plan and Quality Assurance Plan conform with the requirements in the SOW.
…

**Factor 3.  Past Performance**
The Government will evaluate the Offeror's history of successful completion of projects and other deliverables; history of staying on schedule and within budget, cost control, and submitting timely invoices and documents. The Government will evaluate the extent to which the

3

Offeror's specific past performance on prior similar efforts specified within the scope of the SOW. The Government will also evaluate the Offeror's history of successful recruitment and retention of qualified personnel.

The Government may obtain past performance information using the Contractor Performance Assessment Reporting System (CPARS), from historical past performance information on file, and any other sources available for Government reference. Past performance information will be utilized to determine the quality of the contractor's past performance as it relates to the probability of success for this requirement. Subcontractor/CTA member past performance will be considered equally along with the Prime's past performance.

AR 315–16.

Offerors' proposals were assigned a confidence rating for each of the non-price evaluation factors. AR 1878. For Factors 1 and 2, Technical Approach and Staffing Plan, the confidence ratings were defined as follows:

| Rating | Definition and Criteria |
|---|---|
| High Confidence (HC) | The Government has high confidence that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with little or no Government intervention.<br><br>Risk Level: Low |
| Some Confidence (SC) | The Government has some confidence that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with some Government intervention.<br><br>Risk Level: Moderate |
| Low Confidence (LC) | The Government has low confidence that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract even with Government intervention.<br><br>Risk Level: High |
| No Confidence (NC) | The Government has no confidence that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract even with Government intervention. A No Confidence rating in any factor would make the Offeror technically unacceptable and result in removal from competition.<br><br>Risk Level: Very High |

*Id.*

4

For Factor 3, Past Performance, the confidence ratings were described as follows:

| Rating | Definition and Criteria |
|---|---|
| High Confidence (HC) | Based on the Offeror's recent/relevant history of successful performance on recent and relevant projects, the Government has high confidence the Offeror will successfully perform the required effort with little to no Government intervention.<br><br>Risk Level: Low |
| Some Confidence (SC) | Based on the Offeror's recent/relevant history of performance on recent and relevant projects, the Government has some confidence the Offeror will successfully perform the required effort with some Government intervention.<br><br>Risk Level: Moderate |
| Unknown Confidence (UC) | Neutral rating for when no recent or relevant history is identifiable (see FAR 15.305(a)(2)(iii) and (iv)). |

AR 1878-79.

### C.    Offerors' Submissions and Evaluation Results

The Agency received quotes from six Offerors: AccelGov, LLC; [***]; Dynanet Corporation; and [***].  AR 1879–80.  The Agency convened a Technical Evaluation Panel (TEP), which assigned confidence ratings to each quote under the non-price factors and provided narrative evaluations.  *See, e.g.*, AR 1817.  These explanations noted proposal elements that raised and lowered the expectation of success, as well as general comments for each Offeror.  *Id.* These ratings were then repeated and summarized in a Consensus Technical Evaluation Report.  AR 1870.  The TEP removed [***] quote from further consideration after it received a No Confidence rating for both Factors 1 and 2.  AR 1880.  The assigned ratings and price for the five remaining Offerors were as follows:

| Contractor | Factor 1 | Factor 2 | Factor 3 | Total Evaluated Price |
|---|---|---|---|---|
| AccelGov, LLC | Some Confidence | High Confidence | Some Confidence | [***] |
| [***] | Some Confidence | High Confidence | Some Confidence | [***] |
| [***] | Some Confidence | Low Confidence | Some Confidence | [***] |
| Dynanet Corporation | High Confidence | High Confidence | High Confidence | $20,473,360.28 |
| [***] | Some Confidence | Some Confidence | Some Confidence | [***] |

AR 1897–98.

Under Factor 1, Technical Approach, the TEP gave AccelGov a "Some Confidence" rating based on the identification of thirteen items that raised the expectation of success and six items that lowered the expectation of success.  AR 1817–18.  The TEP found that these aspects of AccelGov's proposal raised the expectation of success:

- Demonstrates a clear vision and understanding of SOW.
- Clear understanding of SAMHSA infrastructure.
- Demonstrates understanding in managing complex infrastructure.
- Understanding with RDS [Relational Database Services].
- Extensive understanding in managing Federal IT systems.
- Ability to optimize performance, availability, and scalability.
- Surge support includes technical understanding.
- Strong QA [Quality Assurance] Plan.
- Provides understanding for analyzing requirements.
- Demonstrated understanding in implementing incident problem and change management processes to ensure operations are maintained and operational.
- Understanding in hosting and supporting mission-critical applications.
- Demonstrated understanding in managing cloud-based platforms.
- Understanding of federal cybersecurity regulations and best practices.

*Id*.  On the other hand, the TEP determined that the following aspects of AccelGov's offer lowered the expectation of success:

- Lacks forward thinking.  Quote does not introduce innovative perspectives, as described in the Introduction, Scope & Objectives, Task 2, and Task 9 of the SOW.
- Continuing Status quo.
  - Ex: Excerpt from quote: "We will collaborate with the SAMHSA to define the Zero Trust Architecture (ZTA) when the decision is made to implement it."
  - Ex: Excerpt: "Our team will maintain ongoing situational awareness about the security and privacy posture of the information system and the organization in support of risk management decisions."
- Lacks demonstration of Zero Trust Maturity knowledge and understanding.  (see above for example).
- Approach is heavily dependent on subcontractor.
- Typos in quote show a lack of quality control processes.
  - Ex: [***], page 21.
  - Ex: "SAMHA" page 51.
- PMP Framework is stale and does not propose innovative approaches.

*Id*.  The TEP also provided "General Comments / Observations" about AccelGov's proposal under Factor 1, which stated:

6

> AccelGov's technical approach does not introduce innovative perspectives nor strategies to propel into the future. This technical approach continues the use of methods, tools, and strategies predominantly in place now, without the introduction of new ideas and solutions. The "keep things as they are" approach as identified in this proposal leaves risk for perpetuating stagnation without new insights and maintaining the infrastructure at status quo. As SAMHSA continues to grow and mature, we must stay ahead of the IT curve and provide high-availability data through a robust and reliable network and server infrastructure that follows industry standards and architecture, improve customer collaboration, and be known as a trusted partner that is pro-active and responsive in aligning IT resources with the needs of the program offices. As a result, a rating of some confidence has been given. As the current incumbent of the Infrastructure Services Support Contract, AccelGov possesses the current knowledge for providing IT services across the SAMHSA community, with personnel who have a working knowledge of SAMHSA.

AR 1818.

When evaluating Dynanet under Factor 1, the TEP listed seventeen items that raised the expectation of success and no items that lowered the expectation of success. AR 1851–53. Under "General Comments / Observations," the TEP noted: "Team Dynanet presented a stellar proposal combining small business advantages with robust technical understanding tailored to SAMHSA's needs. Their comprehensive approach across all tasks ensures security, scalability and operational efficiency, making Team Dynanet valuable for enhancing SAMHSA's Infrastructure and Operations." AR 1853.

Under Factor 3, Past Performance, the TEP also rated AccelGov's proposal with "Some Confidence" after assigning one item that raised the expectation of success and three items that lowered the expectation of success. The aspect that raised the expectation of success was:

- SAMHSA Infrastructure Support Services contract – [***]
  - Currently performing the work without issues.
  - [***] CPARS reviews

AR 1822. The aspects that lowered the expectation of success were:

- Upon review of the [***] contract past performance reference provided is associated with a different outside entity (outside the AccelGov JV), thus making it hard to determine whether this past performance is relevant.
- [***] contract:
  - Lacks essential details in: task 5 – surge support strategies particularly personnel; task 7 – EA frameworks; and task 8 – technical aspects of migration services only the high-level process information was provided.
- [***] contract:

7

> ○ Lacks sufficient detail in: task 4 – AWS RDS expertise; task 5 – surge support strategies; task 7 – EA frameworks; task 8 – technical specifics on migration services and no specifics on AWS tools.

*Id.* The "General Comments / Observations" noted:

- Upon review of the [***] contract past performance reference provided is associated with a different outside entity (outside the JV). Is this past performance relevant?
- No past performance provided from [***].
- Past performances: 1 from Prime; 1 from JV; 1 from Strategic Partner.
  - ○ [***] - from JV between [***]; possibly not qualified.
  - ○ [***].
  - ○ [***] – AccelGov.

*Id.*

The TEP awarded Dynanet a "High Confidence" rating under Factor 3 based on eight aspects of the proposal that raised the expectation of success and one that lowered the expectation of success. AR 1859–60. The one item that lowered the expectation of success read: "Issues with previous PM identified with DCSA contract. Onboarded a new PM and issues have been resolved. COR is satisfied." AR 1859. This was the only component of Dynanet's entire proposal that the TEP determined lowered the expectation of success. AR 1850–60. The "General Comments / Observations" for Dynanet under Factor 3 noted: "Dynanet's past performance references are highly relevant to the SOW, as their experience and expertise addresses all tasks in the SOW, and demonstrates a history of successful recruitment and retention of qualified personnel." AR 1860.

### D.   Award Decision

The Contracting Officer ("CO") conducted a best value trade-off analysis after independently reviewing the TEP's non-price evaluation and concurring with the ratings given to each Offeror. AR 1897. The CO noted that the ratings "accurately reflect the evaluation criteria in accordance with the terms and conditions and the technical evaluation factors in the Solicitation." *Id.* The CO also reviewed each Offeror's price, determined that Dynanet's price was reasonable, and reiterated that "[p]rice is the least important factor." AR 1896–97.

In reviewing AccelGov, the CO concluded that although AccelGov's price was [***] lower than Dynanet's price, "AccelGov, LLC's technical approach offered numerous disadvantages when compared to Dynanet's quote." AR 1898. The CO noted the findings that "AccelGov LLC lacks forward thinking, as their quote does not introduce innovative perspectives," and "they prefer continuing [the] status quo." *Id.* The CO quoted specific proposal language that AccelGov's team "will maintain ongoing situational awareness" and will "define the Zero Trust Architecture (ZTA) when the decision is made to implement it." *Id.* The CO repeated that AccelGov "show[s] no forward thinking for change." *Id.* The CO further noted the "difficulties in determining whether the [***] reference was relevant and that the [***] reference lacked sufficient detail in tasks 4, 5, and 7 as well as not providing technical specifics

on migration services or AWS tools." *Id.* The CO concluded that "there were no identifiable advantages presented in AccelGov's quote when compared to Dynanet's" and that as a result Dynanet's proposal "represented the best value." *Id.*

The CO's evaluation of Dynanet described "a stellar quote combining small business advantages with robust technical understanding tailored to SAMHSA's needs." AR 1900. The CO highlighted that "[a]ll past performance references demonstrated relevant successful Infrastructure Operations support and addressed all tasks within the SOW" and that "they met and sometimes exceeded the contractual requirements." *Id.* Overall, there was a "surfeit of items that raised the expectations of their success and the relative absence of items that decrease the expectation of success." *Id.* The CO concluded that "[g]iven the Solicitation's emphasis that the '. . . non-price factors are of equal importance, and when combined, are significantly more important than price . . .' the Government determined that the technical benefits of Dynanet's superior [non-price factors] . . . were worth paying the additional price over the lower rated, lower priced quotes." AR 1901.

### E.    Procedural Background

On September 27, 2024, AccelGov filed its Complaint and Motion for Preliminary Injunction in this Court. Compl., ECF No. 1; Pl.'s Mot. for Prelim. Inj. Dynanet filed an unopposed Motion to Intervene on October 3. ECF No. 13. On October 16, AccelGov filed an amended Complaint. Amend. Compl., ECF No. 27. The parties moved for Judgment on the Administrative Record on October 18, 2024. Pl.'s Mot for J.; Def.'s Mot. for J. on the Admin. R., ECF No. 30; Def.-Intervenor's Mot. The Government filed a corrected Motion for Judgment on the Administrative Record on October 22, 2024. Def.'s Corr. Mot. The parties filed their response and reply briefs on October 25, 2024. Pl.'s Reply, ECF No. 33; Def.'s Reply, ECF No. 35; Def.-Intervenor's Reply, ECF No. 34. The parties' motions are now fully briefed. The Court heard oral argument on November 13, 2024.

## II.    Jurisdiction

The Court of Federal Claims has jurisdiction over protests by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This Court has jurisdiction to adjudicate Plaintiff's claims because AccelGov submitted a quote in response to the Solicitation and asserts it had a substantial chance of receiving the award if not for the Agency's alleged errors. *See* Pl.'s Mot. for J. at 6–7.

## III.    Standard of Review

At issue is whether the Agency's decision was arbitrary, capricious, an abuse of discretion, or contrary to law. *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 425 (2023). "[T]he Court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021). "[A] reviewing court may set aside a procurement action if (1) the procurement

official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (internal quotation marks omitted). "Ultimately, if the Court finds an agency action is within its bounds, it is not for the Court to substitute its own judgment for that of the agency." *CeleraPro*, 168 Fed. Cl. at 425 (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009)).

In reviewing procurement decisions, the Court applies a "presumption of regularity." *Logistics Co., Inc. v. United States*, 163 Fed. Cl. 542, 553 (2022). Contracting officers are "entitled to exercise discretion upon a broad range of issues." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citation omitted). "For that reason, procurement decisions invoke highly deferential rational basis review." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (cleaned up). "The rational basis test asks 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). This standard applies even if the clarity of the agency's decision is "less than ideal" so long as "the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009).

In a "best value" procurement, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "A court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner." *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009).

An even "lower threshold applies for a FAR Part 8 tradeoff analysis." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013). In a FAR Part 8 best value procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (citing *22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at *10 (Fed. Cl. July 21, 2021)). The Court will uphold an agency's best value decision if it was "coherent and a reasonable exercise" of the contracting officer's discretion. *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011).

A plaintiff in a bid protest must also establish that any claimed "errors in the procurement process significantly prejudiced" the protestor. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed. Cir. 2005). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Rather, "[t]o establish that it has suffered a prejudicial error in a post-award protest, a plaintiff is 'required to show that there was a "substantial chance" it would have received the contract award but for the [agency's] errors in the bid process.'" *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 597 (2023) (quoting *Bannum*, 404 F.3d at

10

1358) (alteration in original).  This is because "[o]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations."  *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed. Cir. 1994) (cleaned up).  *See also Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020).

"Prejudice is a question of fact," and a finding must be made from the record evidence. *Off. Design Grp.*, 951 F.3d at 1374.  "The burden to demonstrate prejudicial error . . . lies squarely on the plaintiff."  *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 288 (2024).  Even where a protestor demonstrates an agency acted irrationally in an award decision, "there is no presumption of prejudice."  *Sys. Stud. & Simulation, Inc. v. United States,* 22 F.4th 994, 998 (Fed. Cir. 2021).  "[M]ultiple errors might cumulatively establish prejudice, but not a smaller combination of them."  *USfalcon, Inc. v. United States,* 92 Fed. Cl. 436, 450 (2010).  At a minimum, the plaintiff must show that, with the errors corrected, its "chances of securing the contract" would have increased.  *See Precision Asset Mgmt. Corp. v. United States,* 125 Fed. Cl. 228, 233 (2016) (citing *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  That said, while the test is "more lenient than showing actual causation," it still requires a plaintiff to demonstrate more than "a mere numerical possibility" that its chance of receiving the award would have increased.  *Bannum*, 404 F.3d at 1358.

## IV.    Discussion

AccelGov asserts that the Agency improperly evaluated its proposal with respect to Factor 1 and Factor 3, which resulted in a flawed best value trade-off analysis.  Pl.'s Mot. for J. at 6–7.  However, AccelGov does not challenge the Agency's evaluation of Dynanet's proposal and concedes that even if all the asserted Agency errors were remedied, AccelGov would only, at best, have matched Dynanet's ratings on Factors 1 and 2.  Pl.'s Reply at 16.

AccelGov seeks injunctive relief to remedy alleged Agency errors.  Pl.'s Mot. for J. at 7.  But the record shows that the Agency's evaluation of "Some Confidence" under both factors was reasonable.  Moreover, even if AccelGov is correct that the Agency made some errors, AccelGov has not met its burden to demonstrate any errors were prejudicial.  The Agency's best value trade-off rationally concluded that Dynanet offered a reasonable price and the best value to the Government.  As further detailed below, the Court cannot grant AccelGov's Motion for Judgment on the Administrative Record and order injunctive relief.

### A.    The Agency Reasonably Evaluated AccelGov's Past Performance under Factor 3, and AccelGov Concedes its Past Performance References Lacked Essential Details.

AccelGov claims the Agency acted unreasonably in evaluating its past performance under Factor 3 with a "Some Confidence" rating.  Pl.'s Mot. for J. at 21.  AccelGov does not challenge the Agency's finding that two of its past performance references lacked essential details for some tasks in the SOW.  AR 1822.  *See also* Pl.'s Mot. for J. at 21–24.  In fact, AccelGov concedes that if all challenged Agency errors were remedied, it only "would have matched Dynanet in Factors 1 and 2."  Pl.'s Reply at 16.

AccelGov contends that since the Agency questioned the relevance of one of these references [***], the terms of the Solicitation required the Agency to go no further in evaluating that past contract and regard it as a neutral factor in assessing the proposal. Pl.'s Mot for J. at 24–25. AccelGov also asserts that it was irrational for the Agency to find that it was difficult to determine the relevance of one of the references since the work was performed by [***] (a member of the AccelGov joint venture) as part of a different joint venture. *Id.* at 21–22. Finally, AccelGov alleges the Agency's finding that no reference was provided for [***] (the other member of the joint venture) was both directly contradicted by the record and not a requirement in the Solicitation. *Id.* at 23–24. Yet even if these findings were in error, AccelGov has not established that absent these errors its past performance confidence rating would have changed or that its chances at award would have increased. AccelGov fails to meet its burden of showing prejudice.

1. <u>The Agency reasonably determined that inadequate details in AccelGov's past performance references lowered the expectation of success.</u>

The Agency found that key details were missing in AccelGov's references for the contracts [***] and [***]. AR 1822 (finding that the [***] contract lacked essential details for tasks 5, 7, and 8, and the [***] contract lacked sufficient details for tasks 4, 5, 7, and 8). The CO did not mention the missing details in the [***] contract in the best value trade-off but emphasized the lack of sufficient details for the [***] contract. AR 1898. The Solicitation stated that the Agency would "evaluate the extent to which the Offeror's specific past performance on prior similar efforts" aligned with the SOW. AR 1821. As part of this evaluation, "[p]ast performance information [would] be utilized to determine the quality of the contractor's past performance as it relates to the probability of success." AR 1821–22. The confidence ratings for Factor 3 also noted that the Agency would assign a "[n]eutral rating for when no recent or relevant history is identifiable" as required under FAR 15.305(a)(2)(iii) and (iv). AR 1879.

AccelGov has not shown that the Agency acted unreasonably in lowering the expectation of success for AccelGov's proposal under Factor 3. Agencies act "reasonably and within [their] discretion, and not arbitrarily, capriciously, or contrary to law, when [they] evaluate[] past performance according to the terms of the RFQ." *Distributed Sols.*, 106 Fed. Cl. at 20. *See also Bannum v. United States*, 91 Fed. Cl. 160, 173 (2009) ("An agency does not act unreasonably when it sets forth specific past performance evaluation criteria and then applies those criteria."). AccelGov has not demonstrated that the Agency applied the Solicitation's terms inappropriately in finding that the [***] or [***] references lacked details.

AccelGov contends that the Agency's questions about the relevance of the [***] contract preempted the Agency's ability to determine the probability of success and should have resulted in a neutral rating for this reference. Pl.'s Mot. for J. at 24–25. AccelGov's argument misrepresents the Solicitation's requirements. The Solicitation stated the Agency would evaluate the "extent" to which the references aligned with the SOW, and the Agency found that the reference was missing essential details for some tasks in the SOW. AR 1822. The Agency reasonably determined that this lowered the "probability of success." AR 1822. Contrary to AccelGov's arguments, the Agency's findings are also not contradictory. Pl.'s Mot. for J. at

24–25.  The Agency merely expressed some doubt about the relevance of the reference, but then it still proceeded to apply the terms of the RFQ to assess the reference.  AR 1822.

Further, the confidence rating criteria for Factor 3 indicate that a "neutral" rating of "Unknown Confidence" was appropriate only when the Offeror submitted "no recent or relevant history," and not when the Agency questioned the relevance of one particular reference.  AR 1879.  The Agency reasonably applied the terms of the Solicitation and did not err in using its discretion to assign AccelGov a "Some Confidence" rating under Factor 3.  *See Bannum*, 91 Fed. Cl. at 173.  The Court cannot find that the Agency should have rated the [***] reference as "neutral."  That rating would not be permissible because AccelGov in fact provided references that the Agency found, at least in part, to be relevant.

> 2. <u>Any Agency errors in evaluating the relevance of the [***] contract and past experience for [***] did not prejudice AccelGov.</u>

AccelGov also challenges the Agency's finding that it was difficult to determine the relevance of the [***] contract given [***] work with an outside entity and the lack of experience for [***].  Pl.'s Mot. for J. at 21–24.  However, AccelGov has not met its burden of demonstrating that any alleged errors were prejudicial.  *See Superior Waste Mgmt.*, 169 Fed. Cl. at 288.

In reviewing Factor 3, the Agency determined that one aspect of AccelGov's proposal which lowered the expectation of success was that it was "hard to determine whether" the past performance reference for the [***] contract was relevant.  AR 1822.  The Agency stated this was because the reference "is associated with a different outside entity (outside the AccelGov JV)."  *Id.*  (further noting the contract was a "JV between [***]; possibly not qualified").  AccelGov contends that the [***] reference unambiguously stated that the contract was performed by "AccelGov member [***]" which "provided support as a member of JV [***]."  Pl.'s Mot. for J. at 22 (citing to AR 498).

The regulations governing joint ventures hold that "a procuring activity must consider work done and qualifications held individually by each partner to the joint venture as well as any work done by the joint venture itself previously."  13 C.F.R. § 125.8(e).  Neither the regulations nor the RFQ suggest that a partner in a joint venture cannot rely on experience as part of a different joint venture.  And neither Defendant nor Intervenor point to any authority that would support such a reading.  The Defendant asserts that the [***] reference did not sufficiently address the specific work performed by [***] under the contract.  Def.'s Corr. Mot. at 22–23.  While this may be true, the Agency did not state this was the reason it lowered the expectation of success.  The Agency merely questioned the relevance of the reference because it was performed under a different joint venture.  AR 1822.

Still, even if the Agency's doubt about the reference was irrational, AccelGov has not established that absent this error it would have received a "High Confidence" rating under Factor 3, let alone that there is a "substantial chance it would have received the contract award."  *Bannum*, 404 F.3d at 1358.  "It is not enough . . . that [AccelGov] show that [the Agency] misinterpreted the requirements of the RFQ . . . [AccelGov] must also demonstrate that the

13

misinterpretation prejudiced it." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 736 (2021). AccelGov has not met this burden. As discussed, AccelGov concedes it still would not have matched Dynanet's rating under Factor 3. Pl's Reply at 16. The TEP listed two other aspects that lowered the expectation of success: the lack of details for specific SOW tasks for both the [***] and [***] references. AR 1822. Despite voicing some doubt, the Agency still assessed the "extent to which" the [***] reference aligned with the SOW. AR 1821. The Court has already determined that the Agency's assessments adhered to the RFQ's terms and the Agency reasonably assigned AccelGov a "Some Confidence" rating based on these findings. The record does not demonstrate that AccelGov suffered prejudice because of an, at most, minor error.

For the same reasons, AccelGov fails to establish prejudice with regards to any Agency error in finding that "[n]o past performance [was] provided for [***]." AR 1822. AccelGov claims that the Agency's finding is contradicted by the record and is therefore irrational. Pl's Mot. for J. at 23–24. AccelGov contends the [***] reference did state that [***] had contributed to the contract as a subcontractor. *Id.* at 23 (citing to AR 494). The regulations governing joint ventures do not prohibit the use of past performance references in which the party acted as a subcontractor, or require every member of a joint venture to submit a past performance reference. 13 C.F.R. § 125.8(e). Nor does the RFQ contain any such requirement. But even if the Agency's finding was an error, it was at most "scarcely considered" as a "General Comment / Observation," and it was not treated as an element that lowered expectation of success. AR 1822; *Garrett Elecs., Inc. v. United States,* 163 Fed. Cl. 632, 674 (2023).

Moreover, the alleged errors do not outweigh the Agency's reasoned finding that for two out of three references, AccelGov provided insufficient details about tasks in the SOW under the terms of the RFQ. *See Distributed Sols.*, 106 Fed. Cl. at 20; *USfalcon,* 92 Fed. Cl. at 450 (holding that a small number of errors on their own do not necessarily demonstrate prejudice). And the CO did not explicitly mention the lack of a past performance reference for [***] in conducting the best value trade-off. AR 1898. AccelGov cannot demonstrate prejudice.

3.    AccelGov concedes the relative weakness of its proposal under Factor 3.

AccelGov concedes the weakness of its proposal under Factor 3, stating that even with the challenged "negative findings removed, AccelGov would have matched Dynanet in Factors 1 and 2. The Agency would have had to tradeoff AccelGov's price advantage against Dynanet's Factor 3 advantage." Pl.'s Reply at 16. However, the Solicitation's language was unambiguous that "[p]rice [was] the least important factor" and the "non-price factors [were] of equal importance, and when combined, [were] significantly more important than price." AR 316–17. Accepting AccelGov's arguments, the Agency would still have had to consider Dynanet's Factor 3 advantage as being "significantly" more important than AccelGov's price advantage. *Id.* AccelGov has not shown that the Agency's analysis or conclusions likely would have changed.

Even if a neutral rating were appropriate for the [***] reference, AccelGov does not challenge the Agency's findings on the missing details in its [***] reference. Plaintiff concedes Dynanet would have had a higher rating under Factor 3. Pl.'s Reply at 15–16. A neutral rating

"is not equivalent to the [High Confidence] rating [Dynanet] received," nor does the record demonstrate that a neutral rating for one reference would have changed AccelGov's "Some Confidence" rating. *Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 625 (2007), *aff'd*, 283 F. App'x 813 (Fed. Cir. 2008) (finding an agency's erroneous confidence assessment of a protester's past performance history was not prejudicial because the protestor did not prove, absent the error, it would have had a substantial chance of being awarded the contract).

AccelGov claims it can still establish prejudice despite its concession, but its arguments are unavailing. Pl.'s Reply at 16. Contrary to the facts of cases Plaintiff relies on, AccelGov has not demonstrated it likely "would have received higher scores," *Samsara Inc. v. United States,* 169 Fed. Cl. 311, 319 (2024), or been "assigned an improved technical merit rating." *Thalle Constr. Co., Inc. v. United States,* 159 Fed. Cl. 698, 719 (2022). AccelGov has therefore not shown that any errors were "significant and prejudicial." *Precision Images, LLC*, 79 Fed. Cl. at 627 (citing *Data Gen. Corp.,* 78 F.3d at 1563).

AccelGov would not have had a substantial chance of prevailing even if the Court determines the Agency erred in evaluating Factor 1. The Agency reasonably lowered the expectation of success for AccelGov's proposal under Factor 3 and it is uncontested that Dynanet would have had at least one superior rating on the substantially more important non-price factors absent any alleged Agency errors. *See Golden IT, LLC v. United States,* 165 Fed. Cl. 676, 695-96 (2023), *aff'd,* No. 2023-1992, 2024 WL 4100253 (Fed. Cir. Sept. 6, 2024) (finding that an Offeror did not have a substantial chance of receiving an award where it could not improve its evaluation under one evaluation factor while the awardee received the highest possible ratings for all non-price factors and offered a reasonable price). Nonetheless, as discussed below, Plaintiff also fails to show the evaluators erred in assessing AccelGov's technical approach or that any error would have resulted in a higher rating under Factor 1.

## B.  The Agency Reasonably Evaluated AccelGov's Technical Approach, Management Approach, and Understanding of the Statement of Work under Factor 1.

Plaintiff argues that assigning AccelGov a "Some Confidence" rating under Factor 1 was arbitrary and capricious because the Agency: 1) applied unstated criteria in evaluating the proposal for innovation; 2) failed to credit AccelGov for addressing the Solicitation's requirement to propose improvements; 3) improperly concluded that the proposal was stale and focused on the status quo; 4) unreasonably noted that AccelGov unduly relied on a subcontractor; 5) irrationally found that AccelGov had not demonstrated understanding of Zero Trust Maturity; and 6) should not have assessed that typos in the proposal reflected a lack of quality control processes. Pl.'s Mot. at 7–21. AccelGov contends if not for these errors, it would have received a "High Confidence" rating. *Id.* at 7–8.

### 1.  The Agency did not apply unstated criteria in evaluating AccelGov's proposal.

AccelGov claims that the Agency improperly applied unstated evaluation criteria when it characterized AccelGov's proposal as "lack[ing] forward thinking" and failing to "introduce

15

innovative perspectives, as described in the Introduction, Scope & Objectives, Task 2, and Task 9." Pl.'s Mot. for J. at 8. Plaintiff is correct that the term "innovation" is used only once in the Solicitation. AR 243 ("The Contractor shall develop, implement, and maintain a continuous improvement program . . . that focuses on continual productivity improvement, quality enhancement, lessons learned, and resource savings, and is designed to promote excellence, *innovation*, and efficiencies.") (emphasis added). And the term "forward thinking" does not appear in the Solicitation. This does not, however, mean the Agency erred in evaluating AccelGov's proposal.

The terms "innovation" and "forward thinking" fall well within the reasonable scope of the evaluation criteria set forth in the Solicitation. "[A]n agency . . . has 'great discretion in determining the scope of an evaluation factor.'" *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) (quoting *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). "To succeed on an unstated evaluation claim, an Offeror must show the agency 'used a significantly different basis in evaluating the proposals than was disclosed.'" *Samsara Inc.,* 169 Fed. Cl. at 319 (quoting *Wellpoint Mil. Care Corp. v. United States,* 144 Fed. Cl. 392, 404 (2019), *aff'd,* 953 F.3d 1373 (Fed. Cir. 2020)). AccelGov does not meet this high standard.

In addition to the RFQ's explicit use of "innovation," the Solicitation's Introduction mentioned the need for "[c]ontinued improvement." AR 237. And the Scope & Objectives of the SOW explained the "required outcome is to deliver Infrastructure and Operational Services to SAMHSA to achieve continual service improvements." AR 238. The Solicitation specified "it will be inherent upon the Contractor to recommend improvements," and it stated the Agency would "assess the extent to which the Offeror demonstrates methods for improving the program's operations, reducing costs, and lowering administrative burdens." AR 311, 315. These clearly disclosed requirements should have conveyed to AccelGov that the Solicitation sought innovation and forward thinking. Indeed, the proposal AccelGov submitted only further supports this notion because AccelGov used the term "innovation" multiple times in its proposal. *See, e.g.*, AR 329 ("AccelGov manages teaming relationships to create a seamless organization driven by . . . innovation."); AR 332 ("[S]upporting technical innovations, we understand the technical landscape and the path forward."); AR 333 ("Innovative – Team AccelGov continuously innovates."). Thus, AccelGov seemingly understood innovation to be a relevant criterion throughout its quote.

AccelGov's citation to the differences in the dictionary definitions of "improvement" and "innovation" is unavailing given its own interchangeable use of the terms. Pl.'s Mot. for J. at 9–10. "[T]he integrity of the protest process does not permit a protestor to espouse one interpretation or position during the procurement, and then argue during a protest that the interpretation or position is unreasonable or otherwise improper." *Sys. Implementers, Inc. v. United States,* 162 Fed. Cl. 754, 767 (2022). Based on the record evidence, AccelGov interpreted the scope of the RFQ's requirements to include "innovation" at the time it submitted its proposal. Defendant also points to a different dictionary definition that supports the notion that the terms are commonly used to similar effect in the context of technology and business.

Def.'s Reply at 2 n.4.  In sum, the Agency did not apply unstated evaluation criteria in evaluating AccelGov's proposal under Factor 1.

        2.    <u>The Agency did not act arbitrarily in reducing confidence in AccelGov for failing to propose innovative approaches and focusing on the status quo.</u>

AccelGov also asserts that the Agency acted arbitrarily in finding that a lack of innovation and a focus on the status quo in AccelGov's proposal lowered the expectation of success.  Pl.'s Mot. for J. at 8.   AccelGov claims that it did, in fact, meet the Solicitation's requirement to offer improvements.  *Id.* at 10.  AccelGov points to several instances in its proposal where it discusses its plans to, for example, "improve program operations," "improve productivity," "improve efficiency," and "offer recommendations for improvements."  *Id.* at 10–12 (citing to AR 332, 345, 351).  Plaintiff contends this "is all the Solicitation required."  *Id.* at 12.

This is incorrect.  In a procurement, the Agency is tasked with assessing "the adequacy of the information presented in a proposal," not merely whether the Offeror discussed the proposal's requirements.  *AeroCorp., S.A. v. United States,* 38 Fed. Cl. 739, 763 (1997).  AccelGov's "mere disagreements" with the Agency's conclusions "fail to establish any error."  *See Syneren Techs. Corp. v. United States,* 168 Fed. Cl. 756, 785 (2023).

It is true that "if an agency rests its decision on finding that a proposal fails to mention 'Item X,' and if the proposal does in fact mention Item X, the agency has acted arbitrarily and capriciously because its conclusion is irrational."  *Barbaricum, LLC v. United States,* 172 Fed. Cl. 186, 197 (2024).  However, this does not curtail an agency's discretion to find an Offeror's proposal inadequate when applying subjective evaluation criteria.  Here, the record does not show that the Agency found AccelGov's proposal included no "plans" for improvement or did not mention the terms "improvement" or "innovation."  Such findings would have been irrational given the content of AccelGov's proposal.  The record instead reflects that the Agency analyzed the proposal and concluded that it failed to show "forward thinking for change" and lacked "innovative perspectives."  AR 1818, 1898.  The Court's role is to determine whether "the record contradicts the agency's reasoning in ways that cannot be ascribed to the agency's judgment or expertise."  *Barbaricum,* 172 Fed. Cl. at 197 (2024).

Although neither the TEP nor the CO directly discussed AccelGov's plans for improvement or explained why these plans indicated "no forward thinking for change," AR 1898, the Court cannot second guess the Agency's subjective assessment of the proposal as a whole.  Just because AccelGov included proposed plans for improvements and innovation in its quote, the Agency did not have to find that AccelGov's proposal or plans were, in fact, "forward thinking" or "innovative."  That determination is necessarily based on the Agency's evaluation and judgment.  Neither was SAMHSA "expected nor required to document every decision it makes in rigorous detail."  *22nd Century Techs., Inc. v. United States,* 2021 WL 3856038, at *10.

The Court is required to be highly deferential to the Agency, so long as "the agency's path may reasonably be discerned."  *F.C.C.*, 556 U.S. at 513–14.  "[I]t is not arbitrary for an agency to not provide detailed explanations" for its evaluation of a bidder's approach, "unless

this subjective judgment can be shown to be inconsistently reached." *Inspace 21 LLC v. United States*, 128 Fed. Cl. 69, 89 (2016). Moreover, FAR Part 8 only requires "minimal documentation," although "[a]n agency [still] must articulate a satisfactory explanation for an action to permit effective judicial review." *DigiFlight, Inc.*, 165 Fed. Cl. at 601 (internal quotations omitted) (cleaned up).

Here, the Agency's judgment was not "inconsistently reached" since it lowered the expectation of success for both a lack of innovative perspectives and a focus on the status quo. *Inspace 21 LLC*, 128 Fed. Cl. at 89. AccelGov alleges that an inconsistency exists because the only explicit use of the term "innovation" in the RFQ was in the section on the Quality Assurance ("QA") plan and the Agency determined that AccelGov's QA plan was "strong." Pl.'s Mot. for J at 8 n.2; AR 1818. But the Agency's finding does not show inconsistency; the Agency's assessment that the QA plan was strong does not conflict with its holistic evaluation of the proposal as lacking innovative perspectives. The Agency also included sufficient explanations to permit judicial review. *See, e.g.*, AR 1818 ("PMP Framework is stale and does not propose innovative approaches.").

The Agency's finding that AccelGov's proposal was "stale" and focused on continuing the "status quo" is similarly reasonable and includes quoted examples from AccelGov's proposal explaining the Agency's judgment. AR 1817–18. AccelGov asserts that it included "a method to ensure continuous improvement" as described in "key elements of its management framework." Pl.'s Mot. for J. at 12–13. But the Agency found that AccelGov's "technical approach continues the use of methods, tools, and strategies predominantly in place now, without the introduction of new ideas and solutions" and "leaves risk for perpetuating stagnation without new insights." AR 1818. Again, AccelGov is merely disagreeing with the Agency's judgment and evaluation of its proposal.

Indeed, the record contains numerous examples supporting the finding that AccelGov's plan focused on existing methods, including the proposed approaches to continual improvement. *See, e.g.*, AR 334 (detailing that AccelGov's project management approach is "[i]mplemented on the ground today"). For example, in arguing that the Agency's finding was irrational AccelGov points to a model in its quote that has "Continual Process Improvement" as its centerpiece, but the model is titled "Team AccelGov's *proven* Integrated Management Operation Model for successfully managing SAMHSA." AR 354 (emphasis added). It is not unreasonable that the Agency concluded AccelGov's plans for "continual improvement" were part of the status quo. The Agency acted within its discretion to determine that this aspect lowered its expectation of success in AccelGov. *CeleraPro*, 168 Fed. Cl. at 425.

Defendant did not address Plaintiff's argument that the Agency unreasonably concluded that AccelGov unduly relied on its subcontractor—the incumbent on the contract. Pl.'s Mot. for J. at 17. Intervenor contends that the Court should interpret the Agency's finding as another example of the Agency's concern that AccelGov would continue the status quo. Def.-Intervenor's Mot. at 9 n.2. This interpretation is supported by the Agency's comment that "[a]s the current incumbent of the Infrastructure Services Support Contract, AccelGov possesses the current knowledge for providing IT services." AR 1818. Since the Agency's identified

concern about AccelGov's proposal was the continuation of "methods, tools, and strategies predominantly in place now," the Court can reasonably discern that the comment about the incumbent's "current knowledge for providing IT services" is consistent with the same line of reasoning. AR 1818. *See Inspace 21 LLC*, 128 Fed. Cl. at 89. The Court must defer to the Agency so long as "the agency's path may reasonably be discerned." *F.C.C.*, 556 U.S. at 513–14.

AccelGov contends that the Agency's finding is contradictory since it raised the expectation of success based on incumbency for other reasons. Pl.'s Mot. for J. at 18. While "an agency is not required to ignore the benefits or advantages derived from an Offeror's incumbency," *Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 367 (2022), this does not mean an agency must find that incumbency is an asset in all respects. It is not unreasonable for the Agency to determine that AccelGov's subcontractor being the incumbent was both beneficial with respect to staffing retention and a potential downside for continuing the status quo. At the very least, because the CO did not mention the issue concerning AccelGov's reliance on a subcontractor in the best value trade-off analysis, there is no indication that any Agency error "significantly prejudiced" AccelGov. *Bannum,* 404 F.3d at 1353.

### 3.   The Agency reasonably concluded that AccelGov had not shown the required understanding of Zero Trust Maturity.

AccelGov claims that the Agency acted irrationally in finding that AccelGov's proposal did not demonstrate knowledge and understanding of "Zero Trust Maturity." Pl.'s Mot. for J. at 14. Factor 1 included "the extent to which the Offeror demonstrates a detailed understanding of the requirements and sufficiently identifies proposed methods and techniques for completing each task in the SOW." AR 315. Task 3 of the SOW stated: "The Contractor shall provide support on all Infrastructure security activities . . . including supporting a mature level of Zero Trust." AR 247. Intervenor explains that Zero Trust "is a cybersecurity principle that assumes that there is no implicit trust granted to assets or user accounts based solely on physical or network location, or asset ownership." Def.-Intervenor's Mot. at 11 n.3.

The Agency stated that one example of AccelGov's proposal's insufficiency was a quoted excerpt stating: "We will collaborate with the SAMHSA to define the Zero Trust Architecture (ZTA) when the decision is made to implement it." AR 1881 (quoting AR 337). AccelGov contends that the Agency unreasonably took this quote out of context, which continued: "Our approach includes prioritizing use cases, assigning the current state using the CISA ZTA model, conducting gap analysis, and creating a comprehensive strategy roadmap." AR 337. AccelGov asserts that the longer quote, along with several other mentions of Zero Trust in its proposal, illustrate that the Agency's finding is contradicted by the record and therefore irrational. Pl.'s Mot. for J. at 15–16. AccelGov also claims the longer quote shows its proposal regarding Zero Trust was similar to Dynanet's proposal, albeit not "better than Dynanet's" proposal. Pl.'s Reply at 6. Again, these arguments merely put forth disagreements with the Agency's judgment and do not demonstrate error.

"Offerors carry the burden of presenting 'an adequately written proposal, and an Offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 554 (2009) (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)). While AccelGov's proposal stated it would "design[] everything with a zero-trust mindset" and "maintain secure zero-trust networks," AR 346–47, the Agency was not compelled to find that these mentions demonstrated "knowledge" or "understanding." AccelGov also never addressed the "maturity" of Zero Trust in its proposal. The Solicitation explicitly discussed the need for a "mature level of Zero Trust," and the Agency determined that this component was of particular importance, which is also within the Agency's discretion. *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332.

Plaintiff cites case law that holds an agency is required to read a contract as a whole to argue that SAMHSA failed to consider AccelGov's proposal in its entirety when assessing its knowledge and understanding of Zero Trust. Pl.'s Reply at 6 (citing to *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004)). But there is no indication that the Agency failed to consider AccelGov's proposal as a whole. The Agency merely referenced the quoted portion of AccelGov's proposal as an "example," AR 1817, which is a sufficient explanation of its reasoning in a FAR Part 8 procurement. *Integrated Fin. & Acct. Sols., LLC*, 161 Fed. Cl. at 496. AccelGov has not demonstrated that the Agency acted unreasonably.

4.    There is no evidence that the Agency's findings of typographical errors prejudiced AccelGov.

AccelGov argues that the Agency improperly found that a few typos in its proposal lowered the expectation of success. Pl.'s Mot. for J. at 19. The Agency determined that "[t]ypos in quote show a lack of quality control processes." AR 1817. AccelGov has not demonstrated prejudice even if it is correct that there "is no rational connection" between the exceedingly few typos and "the technical adequacy of AccelGov's proposal." Pl.'s Mot. for J. at 20 (citing to *L3Harris Techs., Inc. v. United States*, No. 24-129C, 2024 WL 1798735, at \*6 (Fed. Cl. Apr. 30, 2024). As the Defendant points out, there is no sign that the Agency "rel[ied] on . . . AccelGov's typographical errors" in the award decision. Def.'s Corr. Mot. at 20. The CO did not mention the typos in the best value trade-off. AR 1898. There is every indication that the award decision would have remained the same even without this error. AccelGov cannot establish prejudice that would entitle it to relief based on a "scarcely considered" de minimis error. *Garrett Elecs.*, 163 Fed. Cl. at 674; *see also Grumman Data Sys. Corp.,* 15 F.3d at 1048.

**C.    The Agency's Best Value Trade-Off Analysis Was Rational.**

In reviewing a best value trade-off in a FAR Part 8 procurement, the Court determines whether the tradeoff decision was coherent and a reasonable exercise of discretion. *Allied Tech.,* 94 Fed. Cl. at 50. *See also Sys. Plus, Inc. v. United States,* 68 Fed. Cl. 206, 211 (2005) (describing the "truncated procurement process" under FAR Part 8 as intended to provide a simplified approach to procurements).

AccelGov asserts that because the CO relied on "fundamentally flawed and arbitrary" evaluations, the resulting best value trade-off was itself arbitrary and capricious. Pl.'s Mot. for J. at 25 (quoting *Bayfirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 695 (2012)). However, the record demonstrates the CO's trade-off analysis was rigorous. "[U]nder FAR subpart 8.4, the contracting officer is required to document the 'basis for the award decision,' which 'should include the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work.'" *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 550–51 (2022) (quoting FAR 8.405(a)(7)(viii)). The CO included a detailed comparison between Dynanet's proposal and the unsuccessful Offerors' technical approaches, staffing plans, past performance, and price, looking beyond the TEP's adjectival confidence ratings. AR 1873–1903; *Weston Sols., Inc. v. United States,* 95 Fed. Cl. 311, 328 (2010), *aff'd*, 440 F. App'x 926 (Fed. Cir. 2011) ("[A]djectival ratings . . . are but guides to, and not substitutes for, intelligent decisionmaking."). The CO also directly compared AccelGov's and Dynanet's strengths and weaknesses. AR 1898. The CO found that Dynanet submitted "a stellar quote combining small business advantages with robust technical understanding tailored to SAMHSA's needs." AR 1900. In contrast, the CO noted several weaknesses in AccelGov's proposal. AR 1898.

As discussed, AccelGov has not demonstrated that any Agency errors would have resulted in higher confidence ratings under either Factor 1 or Factor 3, "thereby rendering [its] lower proposed price more significant in the [Agency's] best value determination." *Samsara*, 169 Fed. Cl. at 331. In other words, AccelGov has not shown that any errors "cumulatively establish prejudice." *USfalcon,* 92 Fed. Cl. at 450. At most, any errors were "scarcely considered." *Garrett Elecs.*, 163 Fed. Cl. at 674.

The CO's best value trade-off referenced the "difficulties determining whether the [***] reference was relevant," which may have been an error. AR 1898. However, the CO also determined that the [***] reference "lack[ing] sufficient details" contributed to the "Some Confidence" rating. *Id.* The record indicates the CO likely considered the lack of essential details in the [***] reference. AR 1822. The CO noted the sharp contrast with Dynanet's ratings under Factor 3 and determined Dynanet's past performance was superior, in part, because Dynanet's references addressed all the tasks in the SOW. AR 1900 ("All [Dynanet's] past performance references demonstrated relevant successful Infrastructure Operations support and addressed all tasks within the SOW."). *See also Sys. Stud. & Simulation, Inc.,* 22 F.4th at 998 (affirming a finding that an agency's error was "harmless error" where the agency "repeatedly emphasized" other aspects of a proposal, "which were independent of the irrational[]" finding). It is also significant that AccelGov concedes even absent the alleged errors, the CO would still have had to consider Dynanet's relative strength under Factor 3. Pl.'s Reply at 16.

Finally, the RFQ was clear that the non-price factors were "*significantly* more important than price." AR 316 (emphasis added). Therefore, the Court must be particularly deferential to the Agency's determination that Dynanet's superiority on the non-price factors justified its

higher, but reasonable, price. Plaintiff relies on *Thalle Constr. Co., Inc.*, but in that case "price [was] equal to all of the other evaluation factors combined." 159 Fed. Cl. at 719.

Even if the Agency erred in evaluating AccelGov under one of the two contested non-price factors, AccelGov's chances of winning the award would not have significantly increased. *Bannum,* 404 F.3d at 1353. The CO's overall conclusion unambiguously favored Dynanet for the "relative absence of items that decrease the expectation of success." AR 1898–1900. The CO also concluded that Dynanet offered a reasonable price that was [***] lower than the Independent Government Cost Estimate. AR 1896–97. And AccelGov does not challenge any aspect of the Agency's evaluation of Dynanet's proposal. Therefore, AccelGov "would still not have a substantial chance to receive [the] award because it cannot improve" its evaluation under Factor 3, while Dynanet "received 'high confidence' ratings" for all non-price factors and "favorable findings for their proposed pricing." *Golden IT, LLC,* 165 Fed. Cl. at 696. In sum, the Court cannot find that AccelGov has met its burden of demonstrating prejudice in the trade-off analysis.

### D.    AccelGov is Not Entitled to Injunctive Relief.

To warrant injunctive relief, a plaintiff must establish each of four factors:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case;

(2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief;

(3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and

(4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because AccelGov has not succeeded on the merits, the Court denies its request for injunctive relief.

## V.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record and Motion for Preliminary Injunction are **DENIED**. ECF No. 29; ECF No. 3. Defendant's and Intervenor's Motions for Judgment on the Administrative Record are **GRANTED**. ECF No. 32; ECF No. 28. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge